IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

KEVIN WILLIAMS,

*Defendant*.

Criminal Action No. ELH-17-0632

**MEMORANDUM OPINION**

Defendant Kevin Williams, who is self-represented, seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), based on the risks associated with COVID-19.  ECF 66 (the "Release Motion").  The defendant has exhausted his administrative remedies.  *See* ECF 66 at 1; ECF 74 at 7; ECF 74-2; ECF 74-3.  And, he has filed a motion to appoint counsel.  ECF 68 (the "Appointment Motion").[1]

The government opposes the Motion (ECF 74), supported by exhibits.  Although the government concedes that defendant's obesity "confers threshold eligibility" (ECF 74 at 20), it argues that defendant has not established an extraordinary or compelling reason for release.  *Id.* at 21.  And, the government argues that even if Williams were eligible for compassionate release, the sentencing factors outlined in 18 U.S.C. § 3553 militate against his release.  ECF 74 at 33-38.  Defendant has not replied.

No hearing is necessary.  For the reasons that follow, I shall deny the Release Motion and the Appointment Motion, without prejudice.

---

[1] The Federal Public Defender has advised that it does not intend to supplement the Motion. ECF 70.

# I.      Procedural and Factual Background[2]

A federal grand jury returned an eight-count Indictment on November 29, 2017, charging the defendant with one count of bank fraud conspiracy, in violation of 18 U.S.C. § 1349; three counts of bank fraud, in violation of 18 U.S.C. § 1344; and four counts of aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1) and (c)(5).  ECF 1.  An Information was filed on October 17, 2018 (ECF 28), charging defendant with Aggravated Identity Theft under 18 U.S.C. § 1028A(a)(1), (c)(4), and (c)(5).

On October 18, 2018, pursuant to a Plea Agreement (ECF 31), the defendant entered a plea of guilty to Count One of the Indictment, which charged him with bank fraud conspiracy, and to Count One of the Information, charging him with Aggravated Identity Theft.  *See* ECF 36.

The Plea Agreement (ECF 31) contained a detailed Stipulation of Facts.  *Id.* at 10-12.  It provided, in part:

> 1.      . . . From September 2012, through in or about July 2015, in the State of Maryland and elsewhere, the Defendant conspired and agreed together with his co-conspirators to execute a scheme and artifice to defraud various financial institutions by cashing stolen checks using the identity of other victims.
>
> 2.      The Defendant is part of an organized group out of Florida who travel around the United States committing check fraud. Traveling groups generally consist of two to four managers and up to six "strikers" (sometimes called "faces") or persons who pass the fraudulent and stolen checks. They travel in rental cars and stay in hotels, sometimes rented using victims' identities and credit cards.
>
> 3.      The managers, including the Defendant, go to locations where individuals often leave their belongings in their car: gyms, parks, athletic fields, etc., and they do smash and grab auto robberies, breaking into vehicles and stealing wallets and purses for the identifications, credit cards and check books -- collectively called "paper." Other items are usually discarded.  The "paper" is provided to the faces, along with glasses and wigs to allow them to resemble the individuals pictured in the stolen ids.  These co-conspirators, generally in teams of

---

[2] The case was initially assigned to Judge Marvin Garbis.  It was reassigned to me due to Judge Garbis's retirement.

a driver and a passenger posing as the victim, travel to banks to cash the checks stolen from victims. The managers are either in another car parked nearby so they can watch both the transaction and look out for police, or they are crouched down behind the front seat.

4.      The Defendant managed a crew and often coordinated crews who were in the same area at the same time. He both obtained the "paper" that was later distributed to faces so that fraudulent checks could be cashed, and traded "paper" between crews as they came and went in a particular area.

5.      For example, on April 30, 201 3, the Defendant aided and abetted co-conspirators Tara Whyte and Ronald Jason Rhoda in attempting to cash a check in the amount of $2000.00, made payable to "AB" and using the Maryland driver's license ending 6787 and Tower Federal Credit Union member number ending 2720 of "AB," all at the Snowden Branch of Tower Federal Credit Union in Columbia, Maryland.

6.      In attempting to cash the check described in Paragraph 5 above, Whyte and Rhoda, aided and abetted by the Defendant, used the name, the Tower Federal Credit Union member number ending 2720, and Maryland driver's license ending 6787 belonging to "AB", all during and in relation to bank fraud conspiracy under 18 U.S.C. §1349, as set forth in Count One of the Indictment and bank fraud under 18 U.S.C. §1344. The Defendant further knew that "AB" was a real person.

7.      As another example, on May 3 and May 4, 2013, the Defendant aided and abetted Whyte in cashing the following checks, all made payable to "AB," using "AB's" Maryland driver's license and Tower Federal Credit Union member number ending 2720:

| Check No. | Amount | Financial Institution Institution | Account Number | Account Holder | Tower Federal Location |
|---|---|---|---|---|---|
| 250 | $500.00 | Security Plus Federal Credit Union | 0275 | "SA" | Millersville Branch, Millersville, MD |
| 1651 | $500.00 | Manufacturers and Traders Trust Company (M&T) | 4138 | "AT" | Arundel Mills Branch, Edgewater, MD |
| 1648 | $500.00 | M&T | 4138 | "AT" | Millersville Branch, Millersville, MD |
| 548 | $500.00 | Bank of America | 3283 | "AY" | Arundel Mills Branch, Edgewater, MD |

8.      In cashing the checks described in Paragraph 7 above, Whyte, aided and abetted by the Defendant, used the name and the Security Plus Federal Credit

Union bank account number ending 0275 belonging to "SA"; the name and M&T Bank account number ending 4138 belonging to "AT"; the name and Bank of America bank account number ending 3283 belonging to "AY"; and the name, Tower Federal Credit Union member number ending 2720, and the Maryland driver's license belonging to "AB", all during and in relation to bank fraud conspiracy under 18 U.S.C. § 1349, as set forth in Count One of the Indictment and bank fraud under 18 U.S.C. § 1344. The Defendant further knew that "AB", "AY", "AT" and "SA" were real persons.

9.      As another example, on June 6 and 7, 2013, Whyte and co-conspirator Lauren Anne Bole, aided and abetted by the Defendant, cashed check numbers 380 and 382, drawn on Bank of America account ending 2573 and belonging to "KS," in the amount of $1,000.00 and $1080.00, respectively, and made payable to "CA," using the Maryland driver's license ending 5802 and "CA's" State Employees' Credit Union (SECU) member number ending 4982 and SECU savings account ending 1206, at the Owings Mills Branch of SECU in Owings Mills, Maryland and the Towson Branch of SECU in Towson, Maryland, respectively.

10.      In cashing the checks described in Paragraph 9 above, Whyte and co-conspirator Lauren Anne Bole, aided and abetted by the Defendant, used the name and Bank of America financial account number ending 2573, belonging to "KS"; and the name, the SECU member number ending 4982, the SECU financial account number ending 1206, and Maryland driver's license ending 5802, all belong to "CA," during and in relation to bank fraud conspiracy under 18 U.S.C. § 1349, as set forth in Count One of the Indictment and bank fraud under 18 U.S.C. § 1344. The Defendant further knew that "KS" and "CA" were real persons.

11. M&T Bank and Bank of America are all FDIC insured institutions. Tower Federal Credit Union, SECU, and Security Plus Federal Credit Union are insured by the National Credit Union Share Insurance Fund.

11. The offense involved more than 10 victims.

In the Plea Agreement, the parties agreed that, under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), defendant's adjusted offense level as to Count One of the Indictment was between 10 and 23.  ECF 31, ¶ 6(g).  And, with respect to Count One of the Information, the parties agreed that, under 18 U.S.C. § 1028A and U.S.S.G. § 2B1.6, defendant was subject to a mandatory, consecutive sentence of 24 months' imprisonment. *Id.* ¶ 6(h).  The

parties "reserve[d] the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a)." ECF 31, ¶ 9.

A sentencing hearing was held on January 15, 2019 (ECF 52), at which evidence was presented. Thereafter, it was continued until January 25, 2019. ECF 59.[3] According to the Presentence Investigation Report ("PSR," ECF 61), defendant was 44 years old at the time. *Id.* at 3.[4] He had neither a high school diploma nor a GED. *Id.*

The PSR indicated that, after two deductions under § 3E1.1(a) of the Guidelines, defendant had a final offense level of 12 as to Count One of the Indictment. *Id.* ¶ 33. But, the PSR made clear that the Probation Office was not provided with enough information from the government to determine whether a 12-level upward adjustment applied under § 2B1.1(b)(1)(G) of the Guidelines. *Id.* ¶ 24.[5] And, concerning Count One of the Information, the PSR reflected that defendant was subject to a mandatory, consecutive term of imprisonment of two years. *Id.* ¶ 34. Moreover, the PSR indicated that Williams had a criminal history score of 11 points, which established a Criminal History Category of V. ECF 61, ¶ 57; *see id.* ¶¶ 38-55.

The Court determined that defendant's total offense level concerning Count One of the Indictment was 23. ECF 64 (Amended Statement of Reasons) at 1.[6] Thus, given Williams's Criminal History Category of V, the Guidelines called for a term of imprisonment in the range of

---

[3] In ECF 74 at 4-5, the government recounts additional evidence it claims to have presented at the sentencing hearings. The Court has notes from the hearing on January 15, 2019, at which several witnesses testified. But, the government has not included a sentencing transcript. Therefore, I have not included a summary of the evidence presented at the sentencing hearing.

[4] A previous version of the PSR was docketed on December 14, 2018. *See* ECF 37. Thereafter, on January 17, 2019, an amended version of the report was filed. *See* ECF 61.

[5] If the 12-level increase applied, defendant would be eligible for a one-point deduction under § 3E1.1(b).

[6] An earlier version of the Statement of Reasons was docketed at ECF 63.

84 months to 105 months as to Count One of the Indictment.  ECF 64 at 1.  And, regarding the Information, the Guidelines corresponded to the statutorily required sentence of 24 months, consecutive.  This yielded a total Guidelines range of 108 to 129 months of imprisonment.  *Id.*

Ultimately, the Court sentenced the defendant to a term of imprisonment of 60 months with respect to Count One of the Indictment and a consecutive term of 24 months as to the Information, for a total term of 84 months' incarceration, with credit for time served since January 18, 2018.  ECF 62 (Judgment).  The Court also ordered restitution in the amount of $198,947.06.  *Id.*

Williams is currently serving his sentence in Beaumont USP in North Carolina. ECF 74 at 20; *see Inmate Locator*, https://www.bop.gov/inmateloc/index.isp (last accessed Apr. 25, 2022). According to the Bureau of Prisons ("BOP"), the defendant has a projected release date of September 5, 2023.  *See Inmate Locator*, https://www.bop.gov/inmateloc/index.isp (last accessed Apr. 25, 2022).   To date, he has served approximately 61% of his sentence.

## II.    Appointment Motion

As mentioned, Williams asks the Court to appoint counsel for assistance in litigating the Release Motion.  *See* ECF 68.  There is no constitutional right to appointed counsel in post-conviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("The right to appointed counsel extends to the first appeal of right, and no further.").  Thus, the determination to appoint counsel in this context rests solely within the discretion of the district court.  *See United States v. Legree*, 205 F.3d 724, 730 (4th Cir. 2000) (explaining that a district court has the discretion to appoint defendant counsel under 18 U.S.C. § 3582(c) in exceptional circumstances).

Williams argues that he should be appointed counsel in this case because he is indigent and "lacks the wherewithal to compile the other necessary documentation to perfect the requisite

showing of extraordinary and/or compelling reason to establish he deserves relief . . . ."  ECF 68 at 1.

In my view, Williams has proven able to establish the legal and factual basis of his claims. Moreover, his case does not present an exceptional circumstance that  warrants the appointment of counsel.  Therefore, I shall deny the Appointment Motion, without prejudice.

### III.    Release Motion

#### 1.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."   18 U.S.C.      § 3582(c)(1)(B);     *see*      *Jackson*,      952      F.3d      at      495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence, if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule of finality.  *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x

862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying  compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release.  *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds that

8

(i) extraordinary and compelling reasons warrant such a reduction; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam); *see also Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission. Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. Moreover, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.

The Fourth Circuit has said that, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)). In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons"

that might merit compassionate release.  *See McCoy,* 981 F.3d at 276-77.[7]

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act.  *McCoy*, 981 F.3d at 276.  Of significance here, it is only "directed at BOP requests for sentence reductions."  *Id.* (citing U.S.S.G. § 1B1.13).  "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States*

---

[7] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

*v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).  In other words, the policy statement does not apply to the court.

Indeed, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction."  *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95.  Consequently, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197.  But, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, No. 21-6960, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *United States v. Harris*, No. 21-6781, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); 28 U.S.C. § 994(t).  However, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *Harris*, 2022 WL 636627, at *1.

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169.  However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.  Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to

compassionate release, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020). And, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States v. Butts*, No. 21-6380, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

As mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant. *McCoy*, 981 F.3d at 284 (citation omitted); *see Jenkins*, 22 F.4th at 169. Nevertheless, compassionate release is a "rare" remedy. *White v.*

*United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94;

*United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16,

2020).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every

§ 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers

a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*,

___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187.  But, a district court abuses

its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized

factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises,"

or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted).

## 2.   COVID-19

The World Health Organization declared COVID-19 a global pandemic on March 11,

2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[8]  Defendant filed his

motion for compassionate release in January 2021.  ECF 66.  At the time, the nation was still "in

the grip of a public health crisis more severe than any seen for a hundred years."  *Antietam*

*Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic."  *United States v.*

*Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).

Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of it.  *Id.*

---

[8] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of
coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease
and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June
15, 2020).

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus. The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16. But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. In February 2022, it updated its guidance to reflect the most available data.

*See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 25, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196.

Particularly at the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed Dec. 9, 2020).  However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").  Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id*.; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to

stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[9]

---

[9] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.).  On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry

---

systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson).[10] Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188. Approximately 66% of the total U.S. population is fully vaccinated, including 28% of people from ages 5 to 11, 59% of people from ages 12 to 17, 73% of people from ages 18 to 64, and 90% of people age 65 and up.  *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last accessed Apr. 25, 2022).

Moreover, approximately 99.7 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older.  *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-

---

[10] Questions as to the efficacy of the Johnson & Johnson vaccine were raised as to the Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron -study*, REUTERS (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J.&J. Vaccine May Be Less Effective Against Delta, Study Suggests*, N.Y. TIMES (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

ncov/vaccines/booster-shot.html (last updated Apr. 15, 2022).   And, federal regulators have recently approved a second booster dose for individuals age 50 and older.   *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention."   *Id.* at 4.   Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of April 25, 2022, the BOP had 137,058 federal inmates and approximately 36,000 staff.   And, by that date, the BOP had administered 348,440 vaccine doses to staff and inmates.   *See* https://www.bop.gov/coronavirus/ (last accessed Apr. 25, 2022).

For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the

magnitude of the decline is its breadth: Cases have been declining in every region."). But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, both around the world and in the United States. It sparked further cause for concern, because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Recently, the number of COVID-19 cases again declined considerably. *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST

(Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.   And, the country generally has begun to return to normalcy.   Nevertheless, we have once again begun to experience an uptick in COVID-19 cases.  *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES  (Apr.  7,  2022),  https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html.

As of April 25, 2022, COVID-19 has infected more than 81 million Americans and caused approximately 991,000 deaths in this country.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Apr. 25, 2022).  And, as of the same date, the BOP reported that 54 federal inmates, out of a total population of 137,058, and 148 BOP staff, out of some 36,000 staff members, currently tested positive for COVID-19.   Moreover, 52,607 inmates and 12,565 staff have recovered from the virus.  In addition, 293 inmates and seven staff members have died from the virus.   The BOP has completed 128,757 COVID-19 tests.   *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to USP Beaumont, where the defendant is imprisoned, the BOP reported that as of April 25, 2022, out of a total of 1,384 inmates, zero inmates or staff have tested positive, zero inmates have died of COVID-19, and 264 inmates and 99 staff have recovered at the facility. In addition, 495 staff members and 3,483 inmates across the USP Beaumont, FCI Beaumont Medium, and  FCI  Beaumont  Low  complexes  have  been  inoculated  with  the  vaccine.   *See* https://www.bop.gov/coronavirus/,  Federal  Bureau  of  Prisons, https://www.bop.gov/locations/institutions/bmp/ (last visited Apr. 25, 2022).

### 3.  Discussion

### A.

Williams, now 47 years of age (ECF 61 at 3), argues that his vulnerability to COVID-19 presents an extraordinary and compelling reason for his release.   ECF 66 at 3-4.

In response, the government claims that a review of the defendant's medical records shows that the only potential risk factor he has with respect to COVID-19 is that his body mass index ("BMI") is greater than 30 kg/m$^2$ but less than 40 kg/m$^2$.  *See* ECF 74-4 (medical records from July 23, 2020 to July 23, 2021, showing BMI of 38.4 kg/m$^2$).  In particular, the government acknowledges that Williams's medical records show that he has a BMI of 38.4, which renders him obese and "confers threshold eligibility" for compassionate release.  ECF 74 at 23; *see* ECF 74-4 at 6 (indicating that defendant has a BMI of 38.4).  But, the government contends, *inter alia*, that defendant's condition does not render him eligible for compassionate release because he has been fully vaccinated against COVID-19.  ECF 74 at 23; *see* ECF 74-5 at 2 (reflecting that Williams received a second dose of the Moderna vaccine on June 10, 2021).   And, in any event, the government argues that the sentencing factors under 18 U.S.C. § 3553 militate against defendant's release.  ECF 74 at 33-38.

Obesity is among the conditions that, according to the CDC, "can make you more likely to get very sick from COVID-19." *See Certain Medical Conditions, supra*.  Moreover, "[t]he risk of severe illness from COVID-19 increases sharply with higher BMI."  *Id.*  Certainly, COVID-19 vaccines effectively reduce the health risks posed by COVID-19.  But, the fact that Williams has been fully vaccinated against COVID-19 does not, by itself, render him ineligible for compassionate release.  *See Spriggs*, 2021 WL 1856667, at *3; *see also United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021) ("It is impossible to predict the

impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues.").

The Court is mindful that the CDC has confirmed that breakthrough infections of COVID-19 among vaccinated individuals occur and, albeit in rare cases, they can result in death. *See Rates of COVID-19 Cases and Death by Vaccination Status*, CTRS. FOR DISEASE CONTROL, Mar. 17, 2022, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last accessed Apr. 13, 2022). To that end, the CDC issued recommendations encouraging "everyone ages 12 years and older [to] receive a COVID-19 booster shot after completing their primary COVID-19 vaccination series." *See COVID-19 Vaccine Boosters*, CTRS. FOR DISEASE CONTROL, https://bit.ly/3MdQMM6 (last updated Apr. 15, 2022). And, the parties have not indicated whether Williams has received a booster shot.

Indeed, several judges of this Court have found that, in light of the dynamic nature of the COVID-19 pandemic, an inmate may be eligible for compassionate release, notwithstanding his vaccination status. *See, e.g.*, *United States v. Hegie*, RDB-14-411, 2022 WL 605383, at *2 (D. Md. Mar. 1, 2022) (finding that, in light of the COVID-19 pandemic, a fully vaccinated defendant who suffered from obesity and asthma presented an extraordinary and compelling reason for his release); *United States v. Coleman*, PWG-17-393, WL 356724, at *3 (D. Md. Feb. 7, 2022) (determining that, given the changing circumstances presented by the COVID-19 pandemic and the absence of any information concerning the inmate's vaccination status, defendant's underlying medical conditions qualified as an extraordinary and compelling reason for his release); *United States v. Rivas*, TDC-19-0417, 2022 WL 36941, at *2 (D. Md. Jan. 4, 2022) (explaining that a vaccinated defendant who was a paraplegic and suffered from frequent urinary tract infections could satisfy the extraordinary and compelling prong of the analysis).

Thus, I am satisfied that, in light of the ongoing COVID-19 pandemic, defendant's obesity constitutes an extraordinary and compelling reason for his release.

**B.**

Having found that defendant is eligible for compassionate release, I must next determine whether the sentencing factors outlined in 18 U.S.C. § 3553 weigh in favor of defendant's release. These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims. *See High*, 997 F.3d at 186.

Williams points out that he is a non-violent offender. ECF 66 at 4. Further, he claims: "There are no victims, nor economic harm cited in Petitioner's case." *Id.* But, these assertions belie the fact that, as the government notes, defendant served as a manager of an "extensive criminal conspiracy which operated in multiple states" and that Williams defrauded numerous victims. ECF 74 at 35.

The crimes were protracted, brazen, and calculated. To be sure, no one was physically injured, but that is not the sole measure of the gravity of an offense. The government has provided the Court with letters from victims of defendant's scheme, in which the victims express their opposition to Williams's request for compassionate release and underscore the negative and long-lasting impact that his conduct has had on their lives. *See* ECF 74-7; ECF 74-8. Against this backdrop, defendant's statements suggest that he does not truly appreciate the gravity of his actions.

Williams has only served approximately 61% of the sentence the Court initially imposed. *See* ECF 62 at 2.  And, the Court imposed a sentence with respect to Count One of the Indictment that was two years below the sentencing range contemplated by the Guidelines.  *See id.*; ECF 64 at 1.  Thus, in my view, the term of incarceration that defendant has served to date does not adequately correspond to the seriousness of the criminal activity that led to his current imprisonment.

Defendant's criminal history also gives the Court pause.  Williams has been convicted of a variety of criminal offenses throughout the course of his adult life, the most recent of which occurred only a few years before defendant's arrest in this case.  *See* ECF 61, ¶¶ 38-55.  Moreover, Williams has previously served substantial jail time as a result of some of these prosecutions.  *See id.* ¶¶ 38, 47-49, 52.  Even so, he was undeterred from engaging in the criminal activity that underlies the instant convictions.

Further, in *Pepper v. United States*, 562 U.S. 476, 492 (2011), the Supreme Court acknowledged that a defendant's post-sentencing conduct "provides the most-up-to-date picture of [a defendant's] 'history and characteristics.'" (Quoting 18 U.S.C. § 3553(a)(1)).  Notably, "[d]uring his time at BOP, in connection with an incident on September 8, 2020, the defendant received discipline for possessing a dangerous weapon (piece of metal) and fighting with another person."  ECF 74 at 35; *see* ECF 74-6 at 2.  This offense is troubling, given defendant's claim that he is not a violent person.  Moreover, the defendant has not offered evidence establishing that, prior to COVID-19 restrictions, he engaged in rehabilitative activities.  Thus, the Court is skeptical that Williams has proven himself committed to his rehabilitation and is concerned that he could pose a danger to the community if he were to be released.

Defendant advises the Court that, following his release from prison, he will "live with his brother or sister following his release from prison and accept continuous support from his extended family and friends who will assist [him] with financing his re-entry, like providing the funding for clothing and housing."  ECF 66 at 4-5.  Additionally, Williams maintains that "with the assistance of his support group," he plans to "obtain[ ] immediate employment at 'The Whole Enchilada.'" *Id.* at 5.

The Court is encouraged that Williams has constructed a plan for his release that will hopefully facilitate his return to society.  Nonetheless, in light of the severity of defendant's crime, his extensive criminal history, as well as his post-sentencing conduct, a balancing of the sentencing factors outlined in 18 U.S.C. § 3553(a) leads me to conclude that defendant's release is not warranted at this juncture.  Accordingly, I shall deny the Release Motion, without prejudice.

## IV.    Conclusion

In light of the foregoing, I shall deny the Release Motion and the Appointment Motion, without prejudice.

An Order follows, consistent with this Memorandum Opinion.

Date: April 27, 2022                                    _____/s/_____

Ellen L.  Hollander
United States District Judge